## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**

**ROBERT E. QUINN,**
**MICHAEL H. HOLLAND,**
**MOHAMMED A. SHARBAF**

**Defendants.**

**Criminal No.  05-0018 (JDB)**

## <u>MEMORANDUM OPINION</u>

On April 28, 2005, a federal grand jury in the District of Columbia handed up a six-count

indictment charging Robert E. Quinn and Michael H. Holland ("defendants"), both of Lexington,

Kentucky -- as well as a third individual, Mohammed A. Sharbaf of Iran -- with violating laws

restricting the export of goods and technology from the United States to Iran.  Trial of defendants

is scheduled to begin on November 7, 2005.  The parties have filed more than a dozen pre-trial

motions, and the Court has received briefing on those motions and heard oral argument from

counsel.  For the reasons stated herein, the Court will (1) deny defendants' motion to transfer the

case to the Eastern District of Kentucky; (2) grant the government's motion to strike portions of

the indictment; (3) grant defendants' motion to dismiss Count One of the indictment for failing to

properly charge the offense of conspiracy; (4) grant in part and deny in part defendants' motions

to strike from the indictment alleged surplusage; (5) deny defendants' as-applied due process

challenge to the laws underlying the offenses alleged; (6) deny defendants' motion to dismiss

Counts Two through Six for failure to state an offense; (7) deny defendants' motion to dismiss

the indictment as duplicitous; (8) defer ruling on the pending evidentiary motions; and (9) deny

defendants' motion for a supplemental jury questionnaire.

## **BACKGROUND**

Defendants were, at all relevant times, employees of Clark Material Handling Company

("CMHC"), a Kentucky-based manufacturer and distributor of lift trucks and lift-truck parts, or

its affiliate company, Clark Material Handling International ("CMHI"), based in Seoul, South

Korea.  See Indict. at 1-2.  Defendant Quinn was CMHC's vice president for global parts

marketing and later became CMHI's executive vice president for global business.  Id. at 2.

Defendant Holland was employed by CMHC as a parts sales representative for its

government/national accounts.  Id.  Mohammed Sharbaf, presently indicted but outside U.S.

jurisdiction, was the president and managing director of Sepahan Lifter Company ("Sepahan"),

based in Esfahan, Iran.  Id.  Alleged co-conspirator Khalid Mahmood "did business as Sharp Line

Trading," based out of Dubai, United Arab Emirates.  Id.

The origin of the laws that defendants are accused of violating can be traced back nearly

100 years to the Trading With the Enemy Act of 1917 ("TWEA"), considered to be the

predecessor to the present-day International Emergency Economic Powers Act ("IEEPA"), 50

U.S.C. §§ 1701-06 (2005).  See United States v. Arch Trading, 987 F.2d 1087, 1093 (4th Cir.

1993) (describing IEEPA as an "extension to" the TWEA).  IEEPA provides that the President

may -- upon declaration of a national emergency -- "regulate ... prevent or prohibit, any ...

transfer ... or exportation of, or dealing in, ... or transactions involving, any property in which any

foreign country or a national thereof has any interest," 50 U.S.C. § 1702(a)(1)(B).  In effect, it

gives the President sweeping authorization to impose economic sanctions on foreign countries to

"deal with an unusual and extraordinary threat [that] has its source in whole or substantial part outside the United States," 50 U.S.C. § 1701(a).  To ensure the effectiveness of those sanctions, IEEPA creates criminal penalties for violations of regulations issued under it.  See 50 U.S.C. § 1705(b) ("Whoever willfully violates, or willfully attempts to violate, any license, order, or regulation issued under this chapter shall, upon conviction, be fined not more than $50,000, or, if a natural person, may be imprisoned for not more than ten years, or both; and any officer, director, or agent of any corporation who knowingly participates in such violation may be punished by a like fine, imprisonment, or both.")

Pursuant to the regulatory authority that IEEPA vests in the Executive Branch, see 50 U.S.C. § 1704 ("The President may issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter."), and a series of executive orders invoking that authority and proclaiming emergencies based on threats to national security, the Department of Treasury has promulgated a series of rules governing trade with Iran.  Collectively known as the Iranian Transaction Regulations ("ITR"), these rules are codified as Part 560 of Title 31 of the Code of Federal Regulations, and they form the basis for the bulk of the charges defendants face.  The Treasury Department's Office of Foreign Assets Control ("OFAC") is responsible for administering these regulations and for granting licenses that authorize transactions with Iran otherwise prohibited by the ITR.  See Indict. at 5.

Also relevant to the current charges is the Export Administration Act ("EAA"), which was originally passed in 1969, comprehensively rewritten in 1979, and subsequently amended. See 50 U.S.C. App. §§ 2101-2420.  That statute empowers the President and the Secretary of Commerce to issue regulations, see § 2414(b), prohibiting or curtailing the export of any goods

or technology for purposes of protecting national security, see § 2404, furthering foreign policy, see § 2405, or addressing supply shortages, see § 2406.  The Commerce Department has promulgated a set of rules, known as the Export Administration Regulations ("EAR") to enforce the EAA, and those regulations are codified at Parts 730-774 of Title 15 of the Code of Federal Regulations.  From its inception, the EAA has had "sunset" provisions, under which it would expire on a specified date unless Congress affirmatively acted to reauthorize the law.  Such a lapse occurred on August 20, 2001.

In anticipation of the EAA's sunset, President George W. Bush issued Executive Order 13,222, which, in relevant part, declared that "[a]ll rules and regulations issued or continued in effect by the Secretary of Commerce under the authority of the Export Administration Act of 1979 ... and all orders, regulations, licenses, and other forms of administrative action issued, taken, or continued in effect pursuant thereto, shall ... remain in full force and effect as if issued or taken pursuant to this order ...."  Exec. Order No. 13,222 § 2, 66 Fed. Reg. 44,025 (August 17, 2001).  The order purported to be an exercise of executive authority pursuant to IEEPA.  Id.

All of the events at issue in this case took place between February 2003 and December 2004, a period during which the EAA was in lapse.  According to the indictment, defendants Quinn, Holland, and Sharbaf collaborated to export CMHC lift-truck parts from the United States to Iran, via Dubai.  See Indict. at 6-8.  The indictment alleges that Sharbaf and an unidentified co-conspirator would send requests to Quinn and Holland for price quotations on CMHC parts, sometimes using Mahmood as an intermediary.  Id. at 7-8.  Quinn and Holland, the indictment states, would provide the quotes and, if Sharbaf and his employer approved of the prices, Quinn and Holland would arrange to ship the parts to Mahmood in Dubai, knowing that Mahmood was

-4-

simply a middleman and that the parts were destined for Iran.  Id. at 8.  All of this, the indictment

asserts, was done without obtaining (or seeking) OFAC approval of the transactions.  Id.

Count One of the indictment alleges the crime of "Conspiracy to Violate the United States

Iranian Trade Embargo," and is based on a series of alleged overt acts in furtherance of that

conspiracy, including a number of e-mail communications among the alleged conspirators.  Id. at

6-16.  Counts Two through Six allege "Violation of the United States Iranian Embargo," as well

as the crime of "aiding and abetting" an offense against the United States, with each count

addressing a separate export transaction.  Id. at 17-20.

## ANALYSIS

### I.      Motion for Transfer of Venue under Rule 21(b)

Defendants have filed a motion to transfer this case to the Eastern District of Kentucky,

pursuant to Rule 21(b) of the Federal Rules of Criminal Procedure, "for the convenience of the

parties and witnesses and in the interest of justice."  In Platt v. Minn. Mining & Mfg. Co., 376

U.S. 240 (1964), the Supreme Court provided federal courts with guidance on how to balance the

conflicting interests of parties with regard to transfer-of-venue motions in criminal cases.  The

parties here agree that Platt states the relevant considerations.  The ten so-called "Platt factors"

are: (1) location of the defendant; (2) location of possible witnesses; (3) location of events likely

to be in issue; (4) location of documents and records likely to be involved; (5) disruption of

defendant's business unless the case is transferred; (6) expense to the parties; (7) location of

counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division

involved; and (10) any other special elements which might affect the transfer.  See id. at 243-44.

The defendant, as the only possible moving party under Rule 21(b), bears the burden of

proving that "all things considered, the case would be better off transferred to another district."

See In re Balsimo, 68 F.3d 185, 187 (7th Cir. 1995).  The fact-intensive and discretionary nature

of the Platt inquiry makes it difficult to generalize about how courts decide which of two districts

is more appropriate when, as here, either venue would be proper.  "No one of [the Platt]

considerations is dispositive, and '[i]t remains for the court to try to strike a balance and

determine which factors are of greatest importance.'"  United States v. Maldonado-Rivera, 922

F.2d 934, 966 (2d Cir. 1990) (quoting United States v. Stephenson, 895 F.2d 867, 875 (2d Cir.

1990)).  Nevertheless, some patterns are discernable.  For instance, several judges have

interpreted Rule 21(b) as favoring the government's choice of forum, so long as venue is proper.

See, e.g., United States v. The Spy Factory, Inc., 951 F.Supp. 450, 464 (S.D.N.Y. 1997)

(recognizing a "general presumption that 'a criminal prosecution should be retained in the

original district'") (citation omitted); In re United States of America, 46 Fed. Appx. 133, 136 (3d

Cir. 2002) (Barry, J., dissenting from denial of mandamus petition) ("all things being equal, a

case should stay put").  In other words, if consideration of the Platt factors leaves the Court in

equipoise, the Court should err on the side of denying the motion to transfer.

Such a view of Rule 21(b) is consistent with the trend in recent years away from granting

transfers to mitigate the financial, emotional, or practical burdens of trial in a distant locale.  A

leading treatise on federal criminal procedure collects "illustrative" cases in which courts have

either granted or denied transfer for reasons of trial convenience, and -- with the exception of an

unusual 1990 case in which the considerations supporting transfer to the Western District of

Washington included the possibility of a volcanic eruption in Alaska[1] -- the most recent cited

opinion in which a district court granted transfer under Rule 21(b) was in 1984.  See 2 C. Wright,

Federal Practice & Procedure: Criminal  § 344 at n.29 (3d ed. 2005) (citing United States v.

Daewoo Indus. Co., Ltd., 591 F.Supp. 157 (D. Ore. 1984)).  The list of cases in which transfer

was denied, on the other hand, includes numerous decisions from the 1990s.  See id. at n.30.  The

collection of cases is not comprehensive,[2] but the Court's own research supports the observation

that transfer under Rule 21(b), although not unheard of, has been rare in recent years.  This is

hardly surprising when one considers the massive expansion of technology and the relative

decline in costs for long-distance travel over the past few decades.

The 1997 Spy Factory ruling out of the Southern District of New York -- a case involving

criminal charges against a Texas-based company and its employees for allegedly conspiring to

import and sell in the United States illegal wiretapping devices -- is reflective of the modern

approach to Rule 21(b) motions.   Then-District Judge Sotomayor conducted a thorough Platt

analysis on defendants' motion to transfer to the Western District of Texas and concluded that

"most of the factors" (i.e., location of witnesses, events, counsel, documents and records, and the

relative accessibility of the respective venues) "weigh[ed] in favor of *neither party*."  See Spy

Factory, 951 F.Supp. at 463 (emphasis added).  Weighing in favor of defendants' motion for

transfer were "the location of the defendants, the potential for disruption of the defendants'

---

[1] See United States v. McDonald, 740 F.Supp. 757, 763 & 764 n.17 (D. Alaska 1990) (noting the risk of eruption of Mount Redoubt).

[2] For example, the case on which defendants rely heavily, United States v. Benjamin, 623 F.Supp. 1204 (D.D.C. 1985), was decided by Judge Oberdorfer in 1985, and the unreported District Court decision that was issued in the Third Circuit case cited above -- In re United States of America, 46 Fed. Appx. 133 (3d Cir. 2002) -- involved a transfer in 2002.

businesses and employment, and the defendants' expenses in trying the case in New York." Id.

The only factors clearly supporting denial of the motion were "the docket conditions of each

district -- to the extent that a transfer would inevitably necessitate some delay in the trial date --

and the defendants' delay in bringing the motion to change venue." Id.  On these facts, the court

found that a change of venue was "unnecessary and not in the interests of justice." See id.  The

denial of the motion to transfer was, however, conditioned on the government's "representation to

make available to the defendant, upon a good faith showing of need, reasonable funds for

transportation to New York City and for subsistence for the defendant and witnesses residing in

the [alternate venue] whom he may reasonably call in his defense." Id. at 464 (quoting United

States v. Wheaton, 463 F.Supp. 1073, 1078 (S.D.N.Y. 1979)).

     A review of the Platt factors in the present case reveals many similarities to the

circumstances in Spy Factory and compels a similar conclusion:

     (1) **Location of defendants.**  All parties agree that this factor favors transfer to Kentucky,

but it is only a minor consideration.  Indeed, the D.C. Circuit has indicated that, although the

defendant's residence is "a factor to be considered," it is "not the controlling factor," and indeed

its significance derives "solely from its relationship to the convenience of witnesses, records, and

counsel." See Jones v. Gasch, 404 F.2d 1231, 1240 (D.C. Cir. 1967).  Likewise, other courts

have observed that "the location of the defendant's home [lacks] 'independent significance in

determining whether transfer to that district would be in the interest of justice.'" United States v.

McManus, 535 F.2d 460, 463 (8th Cir.1976) (quoting Platt, 376 U.S. at 245-46).  Nor does a

defendant's home have any *constitutional* significance.  Quite the contrary, the constitutional

provisions addressing venue speak only in terms of the public's interest in trying criminals in the

vicinity where the criminal acts or omissions occurred (i.e., where the effects of the crime were felt).  See U.S. Const. art. III,  §2, cl. 3 & amend. VI.

(2) **Location of possible witnesses.**  Representations by the parties indicate that this factor provides a slight edge to defendants on their motion to transfer, in that more potential witnesses reside in Kentucky than reside near Washington, D.C.  But there also are numerous witnesses who live in neither location -- such as the investigating agents, who are based in Chicago, and other prosecution witnesses who reside overseas -- and they will be required to travel to either Kentucky or Washington for a trial.  Moreover, the Court declines to assign much weight to the residences of possible character witnesses for the accused (considering the ease with which the number of such witnesses can be inflated pre-trial) and rejects defendants' suggestion that it ought to take account of the relative "effectiveness [of character witnesses] before a distant jury."  See Defs.' Reply Mem. in Supp. of Mot. to Trans. at 4.  Thus, this factor provides only minimal support for a transfer to the Eastern District of Kentucky.

(3) **Location of events likely to be in issue.**  Defendants make much of the fact that no "acts" related to these charges occurred in Washington, D.C., for purposes of the Platt analysis, but they do not dispute that venue is proper here because of the alleged omissions that are part of the crimes charged (namely the failure to secure licenses for exports to Iran from OFAC).  In fact, the events comprising the offenses charged occurred in Kentucky, Washington, and overseas.  To the extent that Platt calls for a consideration of the "location of events," however, that factor appears to contemplate a case where jurors might benefit from a visit to a crime scene or might require some understanding of local geography.  See In re United States of America, 46 Fed. Appx. at 136 (Barry, J. dissenting).  This is not such a case.  Therefore, this factor neither

supports transfer nor weighs against it.

(4) **Location of documents and records likely to be involved.**  In light of the availability of electronic storage and transfer of the documents relevant to this matter, which the parties acknowledge, this factor is of no significance to the analysis.

(5) **Disruption of defendant's business unless the case is transferred.**  Defendants Quinn and Holland report that they are on administrative leave from their respective positions at CMHC.  Nevertheless, they attempt to spin this factor in favor of transfer by asserting that the business activities of CMHC (a *non-defendant*) would be disrupted by a trial in Washington because Kentucky-based CMHC employees will be called to testify.  On its face, this fact is irrelevant under the business-disruption prong of the Platt analysis.

(6) **Expense to the parties.**  On the question of party expenses, defendants contend that they, their families, and their witnesses will incur significantly greater travel and lodging expenses for a trial in Washington, D.C., than they would if the trial were in Lexington, Kentucky.  As in the Spy Factory case, where the government's pledge to pay many of defendants' costs was significant for the Rule 21(b) analysis, this Court considers the fact that CMHC "has established a budget for [defendants'] attorneys fees and trial expenses," Defs.' Reply Mem. Supp. Mot. to Trans. at 7, to be an important consideration.  Although it cannot be disputed that costs for *defendants* and *their witnesses* during the trial period (estimated to be two weeks) will be marginally higher if the trial is held in Washington rather than Kentucky, there would be at least a partially offsetting increase in *prosecution* expenses associated with a trial in Kentucky because the government would have to transfer a cooperating witness, Khalid Mahmood, from the Washington, D.C., prison facility where he is currently incarcerated to a

Kentucky prison, and because government counsel, who are based in Washington, would incur greater travel expenses.  Furthermore, the inevitable delay in trial that would result from a transfer could produce incalculable costs -- for both parties -- that otherwise would not be incurred.  In any event, on the facts now before the Court, there is no way to readily assess whether the *total* cost of trial would be greater or lesser if a transfer were granted at this point in time.  Moreover, the parties conceded at the motions hearing that the record does not permit an assessment of whether the incremental increase in expense to defendants from a trial in Washington are greater than the corresponding increase in expense to the government from a transfer to Kentucky.

Even if the Court is willing to assume that defendants will likely incur some added overall expense if the case remains in Washington, the showing that defendants have made with respect to these costs does not demonstrate a "considerably greater" burden.  See United States v. Jessup, 38 F.R.D. 42, 47 (M.D. Tenn. 1965).  Given that defendants' attorneys fees and trial expenses will, at least in part, be paid by CMHC wherever the trial is held, the Court is unable to conclude that defendants themselves will incur significant additional expenses if the case remains here.  And, although the Court does not conclude that the "financial strength of a defendant," standing alone, "is a reason for rejecting [a defendant's] argument that proof of added expense calls for transfer," see Daewoo, 591 F.Supp. at 164 (emphasis omitted), it takes note of the holdings of other courts that "it is not the fact or size of any expense the defendant may incur as a result of trial in this District but rather his ability to bear the expense that concerns the Court" in conducting a Platt analysis, see, e.g., United States v. Culoso, 461 F.Supp. 128, 136 n.12 (S.D.N.Y. 1978).  Since Platt explicitly calls for courts to consider the "expense to the *parties*,"

376 U.S. at 244 (emphasis added), rather than the "expense to the *defendant*," it is not inappropriate to focus on defendants' financial means when there is no clear evidence that transfer will result in lower total litigation costs for the parties.  Here, defendants have not shown that they will be unable to bear any additional expense resulting from trial in Washington.  On that point, it is significant that neither Quinn nor Holland has made a motion under Rule 17(b) for a court order compelling the government to pay the expenses of essential defense witnesses, see Fed. R. Crim. P. 17(b) ("Upon a defendant's ex parte application, the court must order that a subpoena be issued for a named witness if the defendant shows an inability to pay the witness's fees and the necessity of the witness's presence for an adequate defense."), and that they have access to the CMHC-financed defense fund.  In the final analysis, the alleged increase in party expenses does little to tip the Platt scales in favor of defendants' motion for transfer, and instead must be considered a neutral factor.

(7) **Location of counsel.**  Although defendant Holland's primary counsel resides in Lexington, Kentucky, defendant Quinn's lead counsel resides in Indiana (about a three-hour drive to Lexington[3]) and, as already noted, the prosecuting attorneys reside in or around Washington, D.C.  Thus, this factor either favors the government slightly or is neutral.

(8) **Relative accessibility of place of trial.**  Defendants do not suggest that the federal courthouse in Washington, D.C., is any less accessible than the courthouses in the Eastern District of Kentucky.

(9) **Docket condition of each district or division involved.**  Defendants utilize reports

---

[3] A transfer by this Court to the Eastern District of Kentucky would not guarantee that a trial would take place at the federal courthouse in Lexington.  The Eastern District of Kentucky also includes courthouses in several other localities.

on judicial caseloads, published by the Administrative Office of the U.S. Courts, to argue that this Court suffers from greater "docket congestion" than does the Eastern District of Kentucky, resulting in slower dispositions of criminal cases.  Even if the time from filing to disposition would have been faster had the indictment in this case originally been returned in the Eastern District of Kentucky, there is absolutely no doubt that this case -- currently set for trial commencing on November 7, 2005 -- will reach a disposition here sooner than it would if the case were transferred.  For that reason, the Platt factor of "docket condition" substantially favors denial of defendants' motion.

(10) **Special factors.**  No party has cited any "special elements" that might militate in favor of (or against) the requested transfer.

Upon examination of the Platt factors, the Court concludes that two of the ten (location of defendants and location of witnesses) offer only modest support *for* transfer; one factor (docket condition) weighs clearly *against* transfer; and the remaining seven, including the expenses of the parties, provide *no support for either* position.  Although it might be appealing to simply tally the factors as 2-1 in favor of transfer, Rule 21(b) requires a more nuanced balancing.  Given that the two factors favoring transfer do so only weakly and that the one factor weighing against transfer is very strong, and that an assessment of the expenses of trial based on the present record does not clearly favor transfer, the Court finds that defendants have failed to carry their burden under Rule 21(b) and Platt, and therefore the motion to transfer the case to the Eastern District of Kentucky will be denied.

## II.   Government Motion to Strike Portions of the Indictment

On October 6, 2005, after briefing was complete on all other motions in this case, the

government submitted a motion to strike from the indictment references to some provisions of the EAR in Count One and all references to the EAR in Counts Two through Six.  Although the government continues to maintain that the indictment's reliance on these provisions was proper, it apparently found their inclusion to be superfluous and believed the indictment could survive without them.  It therefore elected to delete those references and submitted a revised version of the indictment for the Court's approval.  <u>See</u> Gov't Mem. Supp. Mot. to Strike at 1.  Defendants subsequently objected to the motion to strike, asserting that the deletions amount to a substantive amendment to the charges voted by the grand jury and, therefore, would violate defendants' Fifth Amendment right to be tried only for offenses presented in an indictment that is returned by a grand jury.  <u>See</u> Defs.' Opp. to Gov't Mot. to Strike at 2.

Ultimately, the parties agree that the proper resolution of this motion -- as well as defendants' motion to dismiss the indictment for duplicity, discussed below -- turns on whether the Court concludes for any count of the indictment that the regulations cited therein are essential elements of an alleged offense, or whether the Court instead determines that the individual references to regulations in each count are simply indications of different means by which defendants committed an alleged offense (any one of which alone could support a conviction).  If the Court were to arrive at the former conclusion, the government's motion to strike would have to be denied based on the Fifth Amendment principle -- articulated in <u>Ex Parte Bain</u>, 121 U.S. 1 (1887), and clarified in <u>United States v. Miller</u>, 471 U.S. 130 (1985) -- that a person cannot be convicted of "an offense that is different from that alleged in the grand jury's indictment," 471 U.S. at 142.  If, however, the Court were to reach the latter conclusion, the case law makes clear that there would be no Fifth Amendment difficulty.

Although the Court believes that the indictment could have been more clearly drafted, it nonetheless agrees with the government's contention that, in substance, each count of the indictment charges "a single violation of a single criminal statute in the United States Code -- that is, § 1705(b) of [IEEPA], 50 U.S.C. § 1705(b)."  See Gov't Opp. to Duplicity Mot. at 1.  In other words, because IEEPA makes it a crime to "willfully violate[], or willfully attempt[] to violate, any license, order, or regulation issued under [IEEPA]," 50 U.S.C. § 1705(b), the references in each count of the indictment to the various regulations -- including the EAR -- are simply the government's way of charging, as it may, the "commission of ... one offense in several ways," see Miller, 471 U.S. at 136.  Therefore, by deleting all references to the EAR in Counts Two through Six and some references to the EAR in Count One, the prosecution is simply "narrowing" the scope of the charges, which "add[s] nothing new to the grand jury's indictment and constitute[s] no [impermissible] broadening."  See United States v. Holland, 117 F.3d 589, 595 (D.C. Cir. 1997) (quoting Miller, 471 U.S. at 136).

Moreover, it is difficult to reconcile defendants' argument that the regulations are so essential to the definition of the offense alleged in each count that it would offend the Fifth Amendment's Grand Jury Clause to alter the charging instrument, see Defs.' Opp. to Gov't Mot. to Strike at 4, with their earlier argument that "each count charges multiple different offenses with separate elements," see Defs.' Mem. Supp. Duplicity Mot. at 3.  If, in fact, defendants' assertion of duplicity were correct, then striking the EAR references would simply remove some of the allegedly "different offenses" from the individual counts.  Defendants acknowledge as much in their briefs on the duplicity motion, stating that one proper cure for a duplicitous indictment "is to require the government to elect among the charges."  See Defs.' Reply Mem.

Supp. Duplicity Mot. at 3 n.1.  That is precisely what the government has done through its motion; it has elected to pursue the argument that defendants are guilty of a crime under IEEPA because they violated specific provisions of the ITR.[4]  Furthermore, the action that the government asks the Court to take in this motion is *precisely* the same action that defendants themselves requested in their motion to dismiss based on the alleged invalidity of the EAR.  See Defs.' Mem. Supp. Mot. to Dismiss Based on Invalid. of Regs. at 3 (demanding, as alternative relief to complete dismissal of the indictment, that "all references in Counts Two through Six ... to the EAA, the EAR and Executive Order 13,222 ... be stricken" from the indictment).

For the above-stated reasons, the Court will grant the government's motion to strike portions of the indictment.

**III.     Motion to Dismiss Based on Alleged Invalidity of EAR**

Defendants have moved to dismiss the indictment, to the extent that it relies on the EAR, on the following grounds: (1) that the EAR did not have the force of law during the period of defendants' alleged violations because the regulations lapsed when the legislation under which they were promulgated, the EAA, expired and the President did not possess *statutory* authority to revive them; (2) that, should the Court accept the government's argument that IEEPA empowered the President to repromulgate the EAR, Executive Order 13,222 nevertheless failed to comply with the statutory prerequisites for the exercise of that power; and (3) that, should the Court determine that the EAR were in effect by virtue of the powers IEEPA vested in the President and

---

[4] The Court, however, does not conclude that granting the government's motion to strike necessarily moots defendants' entire duplicity argument.  Indeed, the government recognizes that its motion would only "*substantially* moot the defendants' duplicity claim."  See Gov't Mem. Supp. Mot. to Strike at 1 (emphasis added).

that Executive Order 13,222 was issued properly, IEEPA nevertheless violates the *constitutional*

principle of separation of powers by improperly delegating legislative functions to the President

(namely, the authority to re-enact, in effect, lapsed legislation).

In light of the Court's decision to grant the government's motion to strike from the

indictment all references to the EAR in Counts Two through Six, those counts now rely

exclusively on the criminal sanctions provided by IEEPA for violations of regulations

promulgated thereunder (specifically the ITR).  Defendants do not dispute the validity of the ITR,

nor do they contend that promulgation of the ITR was an improper exercise of executive

authority under IEEPA.  Hence, there is no challenge to the validity of the statutes or regulations

now underlying Counts Two through Six, and the Court accordingly will treat this defense

motion as a request to dismiss Count One -- the charge of "Conspiracy to Violate the United

States Iranian Trade Embargo," Indict. at 16 -- to the extent that it continues to rely on the EAR.[5]

### A.      Count One's Continued Reliance on the EAR

On the government's theory, Count One states an offense as follows.  IEEPA makes it a

crime to "willfully violate[], or willfully attempt[] to violate, any license, order, or regulation

issued under [IEEPA]," see 50 U.S.C. § 1705(b); the EAR are regulations issued under IEEPA by

virtue of an Executive Order, see Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (August 17,

2001); and the EAR prohibit conspiracies to violate the trade embargo, see 15 C.F.R. § 764.2(d)

(2005) ("No person may conspire or act in concert with one or more persons in any manner or for

---

[5] Defendants acknowledged at oral argument that granting the motion to strike the references to the EAR in Counts Two through Six of the indictment would render moot the arguments in their motion to dismiss insofar as they relate to Counts Two through Six, and would therefore limit their objection on these grounds to Count One.

any purpose to bring about or to do any act that constitutes a violation of the EAA, the EAR, or

any order, license or authorization issued thereunder.").  Therefore, the argument concludes,

IEEPA criminalizes conspiracies to violate the trade embargo.  Of the statutory and regulatory

provisions relied on by the government to support Count One, however, only that single

provision of the EAR -- § 764.2(d) -- references a prohibition on conspiracies.  Neither IEEPA

nor the ITR, both of which Count One also cites as supportive authority for the indictment,

contain a prohibition on conspiracies to violate the statute or regulations issued thereunder.[6]  Nor

has the government charged the conspiracy in Count One under the general federal conspiracy

statute at 18 U.S.C. § 371 (criminalizing conspiracy to commit "any offense against the United

States").[7]  Thus, Count One depends upon the continuing validity of the EAR's conspiracy

provision,[8] and -- notwithstanding the government's suggestions to the contrary -- Count One

requires the government to prove that defendants conspired to violate other substantive

provisions of the EAR (not the ITR, which defendants are charged with actually violating in

---

[6] Notably, the EAA -- on which the government cannot rely because it was not in effect at the time of the alleged acts and omissions in this case -- does criminalize conspiracies "to violate any provision of [the] Act or any regulation, order, or license issued thereunder."  See 50 U.S.C. App. § 2410(b)(1).

[7] The Court expresses no opinion on whether defendants' alleged actions could support a conviction under 18 U.S.C. § 371.

[8] The government acknowledged as much when it filed its motion to strike the references to the EAR in Counts Two through Six.  See Gov't Mem. Supp. Mot. to Strike at n.1 ("Count One still relies on the EAR to the extent necessary to support the conspiracy charge.").  The government maintains that, notwithstanding its motion, the EAR remained in full effect at the time of the charged acts and omissions by virtue of Executive Order 13,222.  The government stated in its motion to strike portions of the indictment that it was withdrawing the references to the EAR in the other counts solely for purposes of "streamlin[ing] the case" and "substantially moot[ing] the defendants' duplicity claim."  See id. at 1.

Counts Two through Six.).[9]

Count One can survive only if the Court agrees that the EAR, and specifically the conspiracy provisions set out in the EAR, continued in effect at the time of the alleged acts and omissions.  For the reasons that follow, the Court concludes that, even if the bulk of the EAR remained in effect by virtue of Executive Order 13,222, the conspiracy provisions of the EAR were rendered inoperative by the lapse of the EAA and could not be repromulgated by executive order under the general powers that IEEPA vests in the President.

**B.      Presidential Power Under IEEPA to Revive the EAR**

Congress either failed or declined -- depending on the view one takes of congressional inaction -- to reauthorize the Export Administration Act of 1979 prior to its sunset date of August 20, 2001.  Ordinarily, such a statutory lapse would leave the implementing regulations without a legislative foundation on which to stand.  See United States v. Larionoff, 431 U.S. 864, 873 (1977) ("in order to be valid [regulations] must be consistent with the statute under which they

---

[9] The government appears to take the position that EAR § 764.2 criminalizes conspiracies to violate the ITR, as well as conspiracies to violate the EAR, because another provision of the EAR (15 C.F.R. § 746.7) "makes any violation of the [ITR] a violation of the EAR."  See Gov't Mem. Supp. Mot. to Strike at 2.  In other words, the government contends that, when § 746.7 is read together with § 764.2, the EAR prohibit conspiracies to violate the ITR.  The problem with the government's position, however, is that § 746.7 does not accomplish what the government asserts it does.  The provision simply acknowledges the potential overlap between transactions covered by the ITR, administered by the Treasury Department's Office of Foreign Assets Control ("OFAC"), and transactions covered by the EAR, administered by the Commerce Department's Bureau of Industry and Security ("BIS"), and explains how an exporter can determine which agency to contact.  See, e.g., 15 C.F.R. § 746.7(a)(3) ("To avoid duplication, exporters or reexporters are not required to seek separate authorization from BIS for an export or reexport subject both to the EAR and to OFAC's Iranian Transactions Regulations.  Therefore, if OFAC authorizes an export or reexport, no separate authorization from BIS is necessary.").  Section 746.7 in no way purports to incorporate the ITR into the EAR wholesale.  The ITR and EAR, therefore, remain separate, and § 764.2 only prohibits conspiracies to violate "the EAA, the EAR, or any order, license or authorization issued thereunder."

were promulgated").[10]  But, in this case, Congress previously passed another statute, IEEPA, that seemingly conferred on the President authority to promulgate regulations similar -- if not necessarily identical -- to those that the EAA had authorized.  IEEPA gives the President "broad authority," Dames & Moore v. Regan, 453 U.S. 654, 672 (1981), to prohibit or otherwise regulate specific types of actions related to (or "transactions involving") any property "in which any foreign country or a national thereof has any interest," such as the "acquisition, holding, ... transfer, ... importation or exportation of, or dealing in" covered property.  See 50 U.S.C. § 1702(b).  Recognizing the overlap with the EAA, President Bush asserted -- as had his predecessors[11] -- that IEEPA empowered him to declare that the EAR would continue in effect "as if issued" pursuant to IEEPA, so long as he also proclaimed a national emergency based on the existence abroad of an "unusual and extraordinary threat" to the United States.  See Exec. Order No. 13,222 § 2; 50 U.S.C. § 1701.  In issuing Executive Order 13,222, the President did just that.

Defendants contend that the President's attempt to use one statute (IEEPA) to unilaterally give force to regulations that were enacted under another, since-lapsed statute (the EAA) was an *ultra vires* act that cannot be supported by any interpretation of IEEPA.  The government,

---

[10] All parties conceded at the motions hearing that they are aware of no other regulatory setting where the statute underlying the regulations lapsed and the regulations nonetheless continued in force by virtue of executive action; nor could the Court locate a pertinent case outside the realm of trade embargoes.

[11] The D.C. Circuit has observed that "[t]he current version of ... the EAA of 1979 ... has lapsed six times, for periods ranging from as short as five days to as long as six years."  Wisc. Project on Nuclear Arms Control v. U.S. Dep't of Commerce, 317 F.3d 275, 278 (D.C. Cir. 2003) ("Wisc. Project").  "Each time the EAA has expired, the President has promptly declared a national emergency and has extended the regulatory scheme by executive order."  Id.

however, counters that the EAR are precisely the kind of regulations that IEEPA contemplates the President promulgating and, moreover, that the drafters of IEEPA envisioned this exact scenario.

The task of construing statutory meaning begins with a consideration of "the extent to which the text of [the statute] answers the question before us."  See Green v. Bock Laundry Mach. Co., 490 U.S. 504, 508 (1989).  If the text is ambiguous, the Court should "then seek guidance from legislative history and from the [code's] overall structure."  See id. at 508-09; see also id. at 528 (Scalia, J., concurring) ("The meaning of terms on the statute books ought to be determined ... on the basis of which meaning is (1) most in accord with context and ordinary usage, and thus most likely to have been understood by the *whole* Congress which voted on the words of the statute (not to mention the citizens subject to it), and (2) most compatible with the surrounding body of law into which the provision must be integrated -- a compatibility which, by a benign fiction, we assume Congress always has in mind.").

As a matter of statutory interpretation, the Court finds merit in the government's argument that, generally speaking, IEEPA's language anticipates that the President or his agents will promulgate rules and regulations much like those contained in the EAR.[12]  But nothing in the language or history of IEEPA -- or in the surrounding body of law into which it is integrated -- gives the Court reason to believe that the statute conferred upon the President the power to criminalize by regulation conspiracies to violate trade embargoes.

---

[12] Contrary to the assertions of defense counsel, IEEPA-based regulations are likely to be exempt from the notice-and-comment requirements of the Administrative Procedure Act as relating to the "foreign affairs function of the United States," within the meaning of 5 U.S.C. § 553(a)(1).

The government, recognizing that the text of IEEPA's penalty provision says nothing about the crime of conspiracy, focuses on legislative history and congressional intent.  It points to the 2003 D.C. Circuit opinion in Wisc. Project as implicit support for its expansive view of IEEPA's reach.  There, the court of appeals, over a vigorous dissent by Judge Randolph, held that data collected as part of the administration of the EAA was exempt from disclosure under Exemption 3 of the Freedom of Information Act ("FOIA") -- which covers information that Congress has specifically permitted to be withheld by statute -- even though the EAA had lapsed at the time the FOIA request was made.  See 317 F.3d at 278.  The court observed that the legislative history of IEEPA evinced "Congress's intent to authorize the President to preserve the operation of the export regulations promulgated under the EAA," id. at 282,[13] and stated that the long history of congressional acquiescence in the "President's ongoing practice of extending the EAA by executive order," id., corroborated its interpretation of that history.[14]  The government

---

[13] The legislative history cited by the court consisted of a single House Report.  See 317 F.3d at 278 (citing H.R. Rep. No. 95-459, at 13 (1977)).  No Conference Report existed, and the Senate Report on the legislation was silent on this point.  See id.

[14] Although it is unnecessary to distinguish Wisc. Project for purposes of this decision, the Court observes that the holding of the case was not based on a conclusion about the validity of the President's extension of the EAR by executive order under IEEPA.  Instead, the court of appeals simply concluded that the EAA's confidentiality provision (which was incorporated into the EAR), when read in tandem with IEEPA, provided the "clearly delineated statutory language" required under FOIA's Exemption 3 to maintain the confidentiality of export-license applications beyond the life of the EAA.  See 317 F.3d at 283.  This conclusion was based on the court's view that the language of FOIA "admits of more than a single statutory source" and that Congress need not "act by a single statute [for] its legislation to qualify as a withholding statute under Exemption 3."  Id.  Wisc. Project did not give force to the EAA (or EAR) during the period of lapse; rather, it gave force to provisions of FOIA in light of court doctrine requiring statutory evidence of "congressional appreciation of the dangers inherent in airing particular data."  See id. at 280 (quoting Am. Jewish Cong. v. Kreps, 574 F.2d 624, 628-29 (D.C. Cir. 1978)).  In the context of the FOIA confidentiality issue under consideration, the court in Wisc. Project simply found it appropriate to consider the lapsed EAA language, as incorporated into the EAR.  Indeed,

contends that this interpretation of the legislative history of IEEPA confirms that Congress meant for IEEPA to give the President all the regulatory and enforcement authority that the EAA conferred, minus the time limitation of the EAA's sunset provision.

However one views the use of such legislative history to divine the meaning of IEEPA when it was passed in 1977, it is plainly inapposite for the present purpose of determining whether IEEPA conferred upon the President the power to criminalize a conspiracy. The EAA, as it existed in 1977, did not contain a conspiracy provision. That language was not added for another eight years. See Export Administration Amendments Act of 1985, Pub. L. No. 99-64, § 112(a), 99 Stat. 120 (1985) ("50 U.S.C. App. 2410(a) ... is amended by inserting after 'violates' the following: 'or conspires to or attempts to violate'"). So, even accepting, as the D.C. Circuit has, that the 95th Congress intended, in passing IEEPA, to confer presidential authority "to preserve the operation of the export regulations promulgated under the EAA" upon expiration of the EAA, see Wisc. Project, 317 F.3d at 282, the law that Congress intended the President to continue in effect did not criminalize conspiracies. This Court is not willing, absent more convincing evidence, to take an additional inferential step and conclude that Congress intended, when it added the conspiracy provision to the EAA in 1985, to expand indirectly the President's authority under IEEPA (i.e., to confer authority on the President to criminalize additional conduct -- such as acts in furtherance of a conspiracy -- not covered by IEEPA). The Court finds that, to the extent the 95th Congress intended in 1977 to preserve the operation of the EAA by vesting emergency powers in the President under IEEPA, that intent can only extend as far as the scope

---

the case turned entirely on the court's understanding of what constitutes appropriate statutory evidence for purposes of FOIA's exemption provision.

of the statutes' substantive coverage in 1977.  No conspiracy provision existed in IEEPA or the

EAA in 1977, and none has since been included in IEEPA.

Turning to the surrounding body of law, the Court considers it significant that when the

99th Congress amended the EAA in 1985 to criminalize conspiracies -- revising the EAA's

violations provision to make it a crime to "willfully violate[] or *conspire*[] to or attempt[] to

violate any provision of this Act or any regulation, order, or license issued thereunder," see 50

U.S.C. App. § 2410(b)(1) (emphasis added) -- it did not make a similar change to IEEPA, leaving

the latter statute with a provision that penalizes only those who "willfully violate[], or willfully

attempt[] to violate, any license, order, or regulation" issued pursuant to its authority, see 50

U.S.C. § 1705(b).  The Supreme Court has specifically admonished courts not to dismiss such

significant variations in statutory language.  See generally W. Va. Univ. Hosp., Inc. v. Casey, 499

U.S. 83, 101 (1991) ("[I]t is not [the] function [of courts] to eliminate clearly expressed

inconsistency of policy and to treat alike subjects that different Congresses have chosen to treat

differently....  Where what is at issue is … merely a difference between the more parsimonious

policy of an earlier enactment and the more generous policy of a later one, there is no more basis

for saying that the earlier Congress forgot than for saying that the earlier Congress felt

differently.").  In fact, what the government is asking the Court to do here is precisely what the

Supreme Court said was impermissible in a case interpreting a provision of the tax code.  See

Iselin v. United States, 270 U.S. 245, 251 (1926) ("What the government asks is not a

construction of a statute, but, in effect, an enlargement of it by the court, so that what was

omitted, presumably by inadvertence, may be included within its scope.  To supply omissions

transcends the judicial function.").

For these reasons, the Court concludes that IEEPA -- whether or not it authorized the President to reissue other regulations promulgated under the EAR "as if they were issued" under IEEPA -- cannot confer authority on the President to promulgate regulations criminalizing conspiracies to violate trade embargoes when neither IEEPA nor the EAA, as written at the time of IEEPA's passage, supplies any basis for a conspiracy offense.

This interpretation of IEEPA is bolstered by several observations.  First, the "rule of lenity" -- which one judge of the D.C. Circuit recently described as "[f]undamental to our fairness-centered criminal justice system," United States v. Barnes, 295 F.3d 1354, 1369 (D.C. Cir. 2002) (Sentelle, J., dissenting) -- cautions that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." United States v. Bass, 404 U.S. 336, 347 (1971). "This policy embodies 'the instinctive distastes against men languishing in prison unless the lawmaker has clearly said he should.'" Id. at 348 (quoting H. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks 196, 209 (1967)).  The Supreme Court has said that the rule of lenity "applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose." See Bifulco v. United States, 447 U.S. 381, 387 (1980).  Therefore, a court, in interpreting the meaning of IEEPA, should take into account the difference between the possible sentence to which the defendants would be subjected if convicted under IEEPA's § 1705(b) for violation of the EAR's conspiracy regulation ("imprisoned for not more than ten years") with the penalty that they would face if convicted for the same acts under another statute -- in this case, the general federal conspiracy statute, 18 U.S.C. § 371 ("imprisoned for not more than five years").  The rule of lenity forbids this Court from inferring an intent by Congress to turn a crime that would otherwise be subject to a five-

year prison term into a crime that would double the potential sentence through the mere grant of

regulatory authority to the President and without so much as a mention of the word "conspire."[15]

Second, the general principle that "a conspiracy and the substantive offense that is its

immediate end do not merge upon proof of the latter," Ianelli v. United States, 420 U.S. 770,

781-82 (1975) (citing Pinkerton v. United States, 328 U.S. 640 (1946)), supports the view that

authorization by Congress to promulgate regulations creating the details of substantive violations

does not, by mere implication, include authorization to promulgate regulations criminalizing

conspiracies to commit a substantive violation.

Third, and finally, it must be noted that neither of the principal cases that the government

relies upon as examples of courts allowing criminal prosecutions for violations of the EAR

during periods in which the EAA had lapsed involved charges of conspiracy *under the EAR*.  See

United States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1078 n.1 (9th Cir. 1982) (en banc)

(conspiracy count relied on 18 U.S.C. § 371); United States v. Mechanic, 809 F.2d 1111 (5th Cir.

1987) (no conspiracy charge).  To allow this conspiracy charge to proceed would, therefore,

constitute an unprecedented interpretation of federal law.

In sum, the Court cannot sustain Count One of the indictment as consistent with IEEPA's

grant of regulatory authority to the President, and therefore the Court will grant defendants'

motion to dismiss Count One for failing to properly charge the offense of conspiracy.  It is

---

[15] See also Stephen F. Smith, Proportionality and Federalization, 91 Va. L. Rev. 879, 931-32 (2005) ("[B]efore expanding an ambiguous statute to encompass a criminal act punished by other criminal laws of the same type, courts should consider whether the maximum penalties authorized by the statute are significantly higher than the penalties that would otherwise apply to that act under other federal statutes ….  If they are, the statute should be narrowly interpreted so that the criminal act is subject to more appropriate levels of punishment under other statutes.").

important to note that the Court is not saying that defendants could not be charged with

conspiracy to violate trade embargo laws, for example under 18 U.S.C. § 371.  But the

indictment does not do so, and, as framed based on the EAR, Count One cannot survive.

Because this decision rests on an assessment of the President's statutory authority under IEEPA,

the Court need not address defendants' claim that the President failed to comply with the

statutory prerequisites for the exercise of his IEEPA power when he issued Executive Order

13,222 or their claim that IEEPA violates constitutional principles of separation of powers and

non-delegation.[16]

## IV.    Defense Motion to Strike Alleged Surplusage in Indictment

Rule 7(d) of the Federal Rules of Criminal Procedure provides: "Upon the defendant's

motion, the court may strike surplusage from the indictment or information."  Pursuant to this

rule, defendants have moved to strike (1) paragraphs 7 through 15 of the indictment (the

paragraphs that describe the history and effect of the various statutes and regulations at issue),

and (2) statements in paragraphs 8 and 17 referencing Iran's support for international terrorism

and the threat that such terrorism poses to the United States.  See Defs.' Mots. to Strike

Surplusage.

"[A] motion to strike surplusage [from an indictment] should be granted only if it is clear

that the allegations are not relevant to the charge and are inflammatory and prejudicial."  United

---

[16] With respect to non-delegation, the Court notes that, were it to conclude that IEEPA conferred on the President the power to create by regulation the crime of conspiracy, notwithstanding the statute's silence on the subject of criminalizing conspiracy, such a conclusion would cut *against* a determination that Congress had imposed the sort of "meaningful[] constrain[ts]" on the exercise of executive authority in IEEPA that the Supreme Court has intimated the Constitution requires in the context of crime definition.  See Touby v. United States, 500 U.S. 160, 165-66 (1991).

States v. Rezaq, 134 F.3d 1121, 1134 (D.C. Cir. 1998).  In other words, there are two distinct

prerequisites for striking superfluous language in an indictment: (1) irrelevance and (2) prejudice

to the defendant.  "[T]he standard under Rule 7(d) has been strictly construed against striking

surplusage."  Id. (quoting United States v. Jordan, 626 F.2d 928, 930 n.1 (D.C. Cir. 1980)).

### A.     Statements of Law

With respect to the indictment's description, in paragraphs 7 through 15, of the content

(and, in some cases, the meaning) of the laws and regulations underlying the charges, the Court

will decline to address the Rule 7(d) motion at this time because the parties have given the Court

no reason to think that jurors would be exposed to the language of the indictment in advance of

deliberations and, in any event, the material currently is neither irrelevant nor prejudicial because

the Court has not determined the applicable law, let alone given instructions on it to the jury

(which has yet to be impaneled).  Indeed, the indictment's description of the laws and regulations

would only become irrelevant and, potentially, prejudicial if the Court were prepared to give

contrary jury instructions, but that stage of the case has not yet been reached.[17]  Therefore, the

Court will deny the motion, without prejudice to renewal at a later point.

### B.     References to Iran's Support for Terrorism

As for the motion to strike as surplusage the two brief references in the indictment to

Iran's support for international terrorism and the threat it poses to the United States, the Court is

persuaded by defendants' arguments -- both in its briefs and orally before the Court -- and will

grant the motion as to the final sentence of paragraph 8 ("The Presidential Notice of March 10,

---

[17] Counsel are cautioned, however, that any reference to the governing law in opening
statements or otherwise during the course of the trial must comport with the actual language of
those provisions and with the Court's decisions on the various motions.

2004, additionally noted that the threat posed by Iran to the United States's national security, foreign policy, and economy included Iran's 'support for international terrorism.'") and as to the final clause of paragraph 17(c) ("a country whose regime had for years been designated by the United States government as a supporter of international terrorism").

With respect to the relevance of these statements, the Court concludes that the policies underlying the trade embargo against Iran are irrelevant to the charges defendants face. Defendants are not charged with providing material support to terrorists or some similar crime. They are accused of trading with a country subject to an embargo without first obtaining government approval for the transactions.  Furthermore, the crime that defendants are charged with is no more or less criminal because of the *reasons* the embargo is in place; the scienter element in this case requires the government to show only that defendants knew their conduct was illegal, not that they understood the policy motivations underlying the decision to prohibit it.[18]  In fact, the United States has imposed economic sanctions and embargoes against nations for numerous reasons that are unrelated to support for terrorism.  For example, it currently enforces embargoes against Burma/Myanmar and Sudan because the governments of those countries have engaged in human-rights abuses.  See Burmese Freedom and Democracy Act of 2003, Pub. L. No 108-61, 117 Stat. 864 (2003); Sudan Peace Act, Pub. L. No. 107-245, 116 Stat. 1504 (2002).

---

[18] Although support for terrorism is among the principal reasons that the United States has imposed a trade embargo against Iran, it is not the only reason.  See, e.g., Exec. Order No. 12,613, 52 Fed. Reg. 41,940 (October 29, 1987) (limiting the importation of Iranian-origin goods because, in addition to Iran's "active[] support[] [of] terrorism as an instrument of state policy," Iran had "conducted aggressive and unlawful military action against U.S.-flag vessels and merchant vessels of other non-belligerent nations engaged in lawful and peaceful commerce in international waters of the Persian Gulf and territorial waters of non-belligerent nations of that region").

And the United States previously has maintained trade restrictions affecting countries that were engaged in armed conflict with a foreign ally, as was the case with the embargo that was at issue in United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936).  Violations of those embargoes are similarly punishable, notwithstanding that they were enacted for reasons other than support for international terrorism.

The potential for prejudice, meanwhile, is substantial because of the seriousness with which the government and the public treat the present war on terrorism.  Although there is no reason to think that the government plans to further invoke the specter of support for terrorism in this trial -- and, indeed, the government has indicated that it does not intend to harp on this point -- there is a real risk that jurors, if shown the indictment, would give improper weight to its references to terrorism, even if the Court instructs them that the indictment does not constitute evidence.  The jury might, therefore, decline to give defendants the benefit of reasonable doubt. The Court is, of course, cognizant that many members of the jury venire are likely to be aware of links between Iran and terrorist activities and that, based on that knowledge, some of those individuals may come to the courthouse with preconceived notions that would cause them to disfavor defendants' case at the outset.  There is, however, a difference between such pre-existing personal views, which each individual juror must pledge to put aside for purposes of deciding the case, and prejudices that are promoted to the entire panel in a government-endorsed document available when jurors retire to consider a verdict -- the latter having much more potential to introduce extrinsic considerations into the deliberative process.

More specifically, the Court observes that the statement in paragraph 8 -- that the March 2004 Presidential Notice "*additionally* noted that the threat posed by Iran" to the United States

"*included* Iran's 'support for international terrorism'" (emphasis added) -- is, by its own terms, cumulative and incomplete.  To borrow (and paraphrase) the words of another judge of this court when confronting a similar motion to strike, the statement "does not provide additional insight into the charges against the defendant, but it only serves to suggest to the jury that the [defendants' conduct] constitute[s] criminal conduct before [they have had] an opportunity to defend [themselves]."  See United States v. Espy, 23 F.Supp. 2d. 1, 10-11 (D.D.C. 1998).  Its deletion from the indictment, moreover, will not impair the government's case in any way, but it will substantially reduce the possibility of prejudice.  As for the language of paragraph 17(c), the Court observes that the danger of prejudice is heightened (and the irrelevance becomes more apparent) because the particular statement that Iran's governing "regime had for years been designated ... as a supporter of international terrorism" falls under the heading of "objects of the conspiracy."  As already noted, there has been no suggestion in this case that one of the objects of defendants' alleged conspiracy was to provide support for international terrorism, or, for that matter, support for Iran's government.

The decision to strike these statements from the indictment, however, does not mean that the United States government's rationale for the embargo may not *become* relevant at trial as the result of a defense strategy or that, if the reasons for the embargo did become relevant, the probative value of that evidence would be substantially outweighed by its potential for prejudice, see Fed. R. Evid. 403.[19]  Rather, this ruling merely reflects the Court's conclusion that, for purposes of the indictment, the statements are not relevant and are prejudicial.

_____

[19] For instance, if the defense attempts to raise a question with the jury as to the importance of the embargo, then the government may be permitted to respond with evidence of the purposes underlying the embargo.

V.      **Motion to Dismiss for Vagueness**

For a federal criminal statute to satisfy the requirements of due process under the Fifth

Amendment it must not be so vague that "it fails to give a person of ordinary intelligence fair

notice that his contemplated conduct is forbidden."  See Papachristou v. City of Jacksonville, 405

U.S. 156, 162 (1972).  Defendants broadly challenge the "statutory and regulatory scheme" under

which they are charged as unconstitutionally vague.  See Defs.' Mot. to Dismiss Under Due

Process Clause at 10.

The gravamen of defendants' objection is that the web of statutes, executive orders, and

regulations is too complex for the average person to understand what is permitted.  Their not-

uncommon lament about the intricacy of the regulatory environment in which they conducted

business, however, does not meet the standard for voiding a statute on vagueness grounds.[20]  In

fact, defendants ignore key language in the leading case they cite, Papachristou, where the

Supreme Court stated that "[i]n the field of regulatory statutes governing business activities,

where the acts limited are in a narrow category, greater leeway is allowed" in terms of what level

of notice can be deemed "fair."  See 405 U.S. at 162; see also United States v. Nat'l Dairy

Products Corp., 372 U.S. 29, 32 (1963) ("statutes are not automatically invalidated as vague

simply because difficulty is found in determining whether certain marginal offenses fall within

their language").  Unlike the vagrancy law nullified in Papachristou, the Iran trade embargo laws

at issue here are not apt to sweep within their coverage the everyday acts of average citizens.

---

[20] Although defendants' briefs refer to their motion as a challenge to the *indictment* on due
process grounds, this particular motion is more properly understood -- as defendants
acknowledge -- as an as-applied challenge to the *laws* underlying the indictment.  Their challenge
to the indictment is framed more clearly in the Fed. R. Crim. P. 7 motion for failure to state an
offense, discussed below.

Rather, they govern the activities of relatively sophisticated individuals who are deliberately engaged in international commerce and, therefore, must be familiar with (if not expert in) various legal regimes -- e.g., customs duties and tariffs -- in multiple countries.  As applied to these defendants, who certainly fall within the class of persons just described, the statutes and regulations can hardly be seen as enigmatic.  Defendants' professed inability to comprehend jargon such as "transship" and "reexport" rings hollow.  Certainly to persons whose jobs involved international trade, these words -- especially in the context of the statutes and regulations in which they are used -- have fairly obvious meaning.

Furthermore, all parties agree that, for defendants to be convicted in this case, the prosecution must establish beyond a reasonable doubt that they "acted with knowledge that [their] conduct was unlawful," see United States v. Homa Int'l Trading Corp., 387 F.3d 144, 147 (2d Cir. 2004).  In other words, this is a case where ignorance of the law *is* a defense; the inability to appreciate the meaning of the law negatives the *mens rea* required for conviction, and defendants are free to argue that to the jury.  Hence, concerns about defendants being convicted under a law that they could not have reasonably understood are alleviated.  See generally Screws v. United States, 325 U.S. 91, 102 (1945) ("The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain.  But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.").

Accordingly, the Court will deny defendants' due process challenge to the laws underlying the indictment.

**VI.     Motion to Dismiss for Failure to State an Offense in Counts Two through Six**

Defendants have moved to dismiss Counts Two through Six on the grounds that those

counts of the indictment fail to provide "a plain, concise, and definite written statement of the

essential facts constituting the offense charged," as required by Rule 7(c)(1) of the Federal Rules

of Criminal Procedure, and that this failure contravenes defendants' Fifth Amendment right to be

tried only for offenses voted on by a grand jury.  Their argument focuses on the scienter element

of the alleged offense, which they say is improperly described by the indictment.  All five of the

challenged counts use the term "willfully" to describe the *mens rea* underlying the charges, which

echoes the language of IEEPA.  See 50 U.S.C. § 1705(b) (prescribing penalties for anyone who

"willfully violates, or willfully attempts to violate, any license, order, or regulation issued under

[IEEPA]").  The parties agree, however, that a conviction under this provision of IEEPA requires

more than mere voluntariness of action (or omission), but instead criminalizes conduct only if

undertaken with knowledge that it was unlawful.  In other words, in this context, "willfully"

means "with knowledge of illegality."  The question raised by defendants' motion, then, is

whether the use of the term "willfully" is so generic or imprecise that either (1) defendants are

not "sufficiently apprise[d] ... of what [they] must be prepared to meet," Russell v. United States,

369 U.S. 749, 763 (1962), or (2) the Court cannot be certain that the grand jury found probable

cause for the requisite mental state.  In short, defendants contend that imprecision of language

has rendered the charging instrument fatally defective.

With regard to whether the indictment "sufficiently apprises" defendants of the charges

they face, the Court recognizes that "where the definition of an offence ... 'includes generic terms,

it is not sufficient that the indictment shall charge the offence in the same generic terms as in the

definition ...."" Russell, 369 U.S. at 764.  But the Court also takes heed of the Supreme Court's

subsequent declaration that "[i]t is generally sufficient that an indictment set forth the offense in

the words of the statute itself," so long as those words leave  no uncertainty or ambiguity about

the elements of the offense.  Hamling v. United States, 418 U.S. 87, 117 (1974).

Viewed in this way, the notice aspect of this motion is substantially identical to

defendants' vagueness challenge (discussed and denied above) and the Court will reject it for

substantially the same reasons.  Rule 7(c)(1) of the Federal Rules of Criminal Procedure cannot

be construed as demanding that an indictment provide the accused with more notice of the

elements of the crime charged than the Due Process Clause of the Fifth Amendment demands

that the underlying statute provide.  And, as the Court stated in Hamling, "lack of precision is not

itself offensive to the requirements of due process.  The Constitution does not require impossible

standards; all that is required is that the language conveys sufficiently definite warning as to the

proscribed conduct when measured by common understanding and practices."  418 U.S. at 111

(quoting Roth v. United States, 354 U.S. 476, 491-92 (1957) (internal quotations and punctuation

omitted)).  Defendants reliance on two principal cases -- United States v. Pickett, 353 F.3d 62

(D.C. Cir. 2004), and United States v. Du Bo, 186 F.3d 1177 (9th Cir. 1999) -- is misplaced.  In

Pickett, the D.C. Circuit said an indictment was insufficient where it "track[ed] *only part of* the

statutory language," 353 F.3d at 67 (emphasis added), and omitted text of the statute that was

essential to the definition of the offense.  In this case, the indictment precisely tracked the

relevant *mens rea* language of IEEPA.  In Du Bo, the fatal flaw in the indictment that the Ninth

Circuit identified was its failure to properly state *any* intent standard for the alleged Hobbs Act

violation (it merely accused the defendant of acting "unlawfully" by the "wrongful" use of force).

See 186 F.3d at 1179.  By contrast, in the present case, the indictment does state a *mens rea* requirement; it merely fails to provide further explication of the meaning of "willful."

As for whether the imprecise use of the term "willfully" in Counts Two through Six casts doubt on the validity of the grand jury's finding of probable cause on the scienter element of the charged offenses, the Court again observes that the indictment was inartfully drafted.  Indeed, defendants point out that Count One of the indictment, the now-dismissed conspiracy count, charged defendants with acting "knowingly and willfully," see Indict. at 6, whereas Counts Two through Six merely charge "willful" violations.  Defendants contend that the "inclusion of a more specific allegation of *mens rea* in one count followed by the exclusion of any allegation of that necessary element in the other five counts" supports a determination with respect to Counts Two through Six that the grand jury could not have found probable cause that defendants acted with knowledge their conduct was illegal.  See Defs.' Mem. Supp. Mot. to Dismiss for Fail. to State Off. at 4.  The government responds that the variation simply reflects a "pleading convention" with respect to conspiracy counts, see Gov't Opp. to Defs.' Mot. to Dismiss for Fail. to State Off. at 3, and cautions the Court against reading too much into this single reference to a knowledge requirement.  Although the Court is puzzled by this inconsistency, it will not engage in Monday-morning quarterbacking of a grand jury that has returned otherwise facially valid charges -- particularly when it would be doing so in reliance on the language of an already-dismissed count.  The Supreme Court has taken a decidedly dim view of such practices, stating that there is no authority "for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof, or whether there was a deficiency in respect to any part of the complaint."  United States v. Williams, 504

U.S. 36, 54 (1992) (quoting <u>United States v. Reed</u>, 27 F. Cas. 727, 738 (C.C.N.D.N.Y. 1852)).

The Court cannot, under the circumstances presented, conclude that the grand jury's use of the statutory language to state the scienter element of the charged offense violates defendants' rights.  Hence, the Court will deny defendants' motion to dismiss Counts Two through Six for failure to state an offense.

**VII.    Motion to Dismiss for Duplicitous Charging**

As discussed already, defendants have moved to dismiss the indictment for duplicitous charging.  In light of the Court's decision to dismiss Count One of the indictment and to grant the government's motion to strike all references to the EAR in Counts Two through Six, little remains of the provisions of the indictment to which defendants principally objected in their motion to dismiss for duplicity.  Nevertheless, the motion is not entirely moot, and so the Court will address the claims raised therein.

Duplicity "is the joining in a single count of two or more distinct and separate offenses." <u>United States v. Klat</u>, 156 F.3d 1258, 1266 (D.C. Cir. 1998).  In this case, the Court is now left with an indictment of five counts, each of which details a separate event or transaction that could sustain a conviction under 50 U.S.C. § 1705(b).  For each count, the government cites to the same three provisions of the ITR to indicate which IEEPA-based regulations defendants are accused of "willfully violat[ing], or willfully attempt[ing] to violate" in contravention of §

1705(b) -- 31 C.F.R. §§ 560.203,[21] 560.204,[22] and 560.205.[23]  (Only the first two regulations are

relevant to this analysis, however, because the third clearly applies only to the absent co-

defendant Sharbaf.)  Each count also relies on 18 U.S.C. § 2, which states that whoever "aids,

abets, counsels, commands, induces or procures" the commission of an "offense against the

United States," or "willfully causes" such an offense to be committed, is punishable as a

principal.

      This method of charging is entirely consistent with Rule 7 of the Federal Rules of

Criminal Procedure, which states that, in an indictment, "[a] count may allege that ... the

defendant committed [the offense] by one or more specified means," see Fed. R. Crim. P. 7(c)(1),

and therefore the indictment is not duplicitous.  The Court concluded above, in considering the

---

[21] Section 560.203 provides: "Any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part is hereby prohibited." 31 C.F.R. § 560.203.

[22] Section 560.204 provides: "[T]he exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited."  It further defines these prohibited activities as including transactions involving a person in a third country if those transactions are "undertaken with knowledge or reason to know that" the goods, technology, or services are "intended specifically" for subsequent delivery to Iran or for incorporation into other goods, technology, or services that will be delivered "exclusively or predominantly to Iran." 31 C.F.R. § 560.204.

[23] Section 560.205 applies only to activities by a "person other than a United States person," and apparently is included in the indictment because Sharbaf, an Iranian citizen, is a named defendant.  The Court concludes that because Quinn and Holland are certainly "United States person[s]" within the meaning of the ITR, see 31 C.F.R. § 560.314 (defining a "United States person" for purposes of the ITR as "any United States citizen, permanent resident alien, ... or any person in the United States"), and because the language of § 560.205 leaves no doubt that it is applicable exclusively to foreign nationals, there is no ambiguity or confusion about whether Quinn and Holland must defend against that specific charged violation.  They need not, and therefore the Court will disregard references to § 560.205 for purposes of the duplicity analysis.

government's motion to strike references to the EAR in the indictment, that the individual counts

of the indictment in fact allege alternate means of committing the same offense, and it again

confirms that determination.  Defendants are accused of participating in five separate unlawful

transactions.  To sustain a conviction under 50 U.S.C. § 1705(b), the government must show for

each count: (1) defendants knew or had reason to know that the products they intended to ship to

the United Arab Emirates were intended for subsequent delivery to Iran, see 31 C.F.R. § 560.204;

(2) defendants knew that such a chain of transactions was prohibited by law, see 50 U.S.C. §

1705(b) (imposing criminal liability on those who "willfully" engage in prohibited conduct); and

(3) knowing this, defendants did one or more of the following: (i) tried to evade or avoid the

requirements of the law, see 31 C.F.R. § 560.203, (ii) attempted to engage in conduct that would

violate the law, see 50 U.S.C. § 1705(b), (iii) succeeded in violating the law, see id., or (iv) aided

or abetted another person in doing one of the foregoing, see 18 U.S.C. § 2.

    There is no duplicity in these charges; each count simply describes alternate means of

committing the same offense based on the same set of events.  It is common for averments of

committing and attempting to commit a substantive offense, as well as aiding and abetting, to be

joined in a single count.  Indeed, had prosecutors organized the charges in the indictment by

regulation rather than by event -- or separated out attempt, evasion, and aiding and abetting as

distinct counts -- the Court would be faced with the greater danger of "inappropriate multiple

punishments for a single criminal episode."  See United States v. Mangieri, 694 F.2d 1270, 1282

(D.C. Cir. 1982).

The Court, therefore, will deny defendants' motion to dismiss for duplicity.[24]

## VIII.   Evidentiary Motions

The parties have filed numerous motions related to the use of evidence in this case, on which the Court has heard argument as well as testimony.  Following the motions hearing, the Court requested supplemental briefing from the government on one of those issues, and it has received the government's response to that request.  The Court will not address the evidentiary questions in this memorandum opinion, but will resolve those motions expeditiously, in a separate opinion and order, so that all parties will have sufficient advance notice of the Court's rulings for purposes of trial preparation.

## IX.   Defense Motion for Supplemental Jury Questionnaire

Defendants have requested that the Court ask potential jurors to answer a set of written questions, proposed by defendants, which they say will facilitate and expedite the *voir dire* process at trial and better ensure that would-be jurors are properly screened for prejudice.  See Defs.' Mem. Supp. Mot. for Suppl. Juror Ques. at 1-3.  Defendants assert that a questionnaire will be more effective than oral *voir dire* at eliciting "honest and accurate information," id. at 4, because responses will be private and jurors thereby will be relieved of "the social pressure to provide responses ... that make one appear to be a fair-minded individual," id.  The Court is mindful of such considerations, but nonetheless finds the use of defendants' questionnaire is unnecessary in this case to ensure proper juror screening.  This Court's regular practice includes

---

[24] It must be noted that, even if the Court were to conclude that the indictment was impermissibly duplicitous, such a conclusion would not compel dismissal of the charges.  See 1A C. Wright, Federal Practice & Procedure: Criminal  § 142 (3d ed. 2005) ("duplicity ... [is] not fatal to an indictment or information").

safeguards designed to protect the privacy of potential jurors -- including the use of cards on

which venirepersons can indicate affirmative responses to *voir dire* questions, which then results

in a follow-up examination conducted privately at the bench -- and the Court is satisfied that this

procedure will be sufficient for this trial, as well.  Therefore, the Court will deny defendants'

motion for a supplemental jury questionnaire.  Although some of the particular questions

suggested by defendants for the questionnaire do not seem appropriate or necessary, the Court

will consider all suggestions when it crafts the *voir dire* questions to be used in selecting a jury.

## <u>CONCLUSION</u>

For the foregoing reasons and based on the entire record, the Court will (1) deny

defendants' motion to transfer the case to the Eastern District of Kentucky; (2) grant the

government's motion to strike portions of the indictment; (3) grant defendants' motion to dismiss

Count One of the indictment for failing to properly charge the offense of conspiracy; (4) grant in

part and deny in part defendants' motions to strike from the indictment alleged surplusage; (5)

deny defendants' as-applied due process challenge to the laws underlying the offenses alleged; (6)

deny defendants' motion to dismiss Counts Two through Six for failure to state an offense; (7)

deny defendants' motion to dismiss the indictment as duplicitous; (8) defer ruling on the pending

evidentiary motions; and (9) deny defendants' motion for a supplemental jury questionnaire.  A

separate order has been issued on this date.


<u>        /s/ John D. Bates        </u>
JOHN D. BATES
United States District Judge


Dated: <u>  October 21, 2005 (amended November 23, 2005)  </u>

Copies to:

Jay I. Bratt
Laura A. Ingersoll
OFFICE OF THE U.S. ATTORNEY FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
Email: jay.bratt@usdoj.gov
Email: laura.ingersoll@usdoj.gov

 *Counsel for the United States*


Aitan Dror Goelman
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Washington, DC  20036-5802
Email: agoelman@zuckerman.com

Larry A. Mackey
BARNES & THORNBURG, LLP
11 South Meridan Street
Indianapolis, IN  46204
Email: larry.mackey@btlaw.com

 *Counsel for defendant Robert E. Quinn*


Richard E. Plymale
FROST BROWN TODD, LLC
250 West Main Street, Suite 2700
Lexington, KY  40507-1749
Email: rplymale@fbtlaw.com

Robert Martin Adler
Paul L. Knight
O'CONNOR & HANNAN, LLP
1666 K Street, NW, Suite 500
Washington, DC  20036
Email: radler@oconnorhannan.com
Email: pknight@oconnorhannan.com

 *Counsel for defendant Michael H. Holland*