**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA**

**v.**

**ROBERT E. QUINN,**
**MICHAEL H. HOLLAND,**
**MOHAMMED A. SHARBAF**

**Defendants.**

**Criminal No.  05-0018 (JDB)**

---

**MEMORANDUM OPINION**

On October 25, 2005, a federal grand jury in the District of Columbia handed up a six-count superseding indictment charging Robert E. Quinn and Michael H. Holland ("defendants"), employees of Kentucky-based Clark Material Handling Company ("CMHC") -- as well as a third individual, Mohammed A. Sharbaf of Iran -- with violating laws restricting the export of goods from the United States to Iran.  According to the indictment, defendants and Sharbaf collaborated to export forklift truck parts from the United States to Iran, via the United Arab Emirates ("UAE").  See Indict. at 5-7.

The indictment alleges that Sharbaf and an unindicted co-conspirator in Iran would send requests to Quinn and Holland for price quotations on CMHC parts, sometimes using an intermediary in the UAE named Khalid Mahmood.  Id.  Quinn and Holland, the indictment alleges, would provide the quotes and, if Sharbaf and his employer (Sepahan Lifter Company) approved of the prices, Quinn and Holland would arrange to ship the parts to Mahmood, knowing that Mahmood was simply a middleman and that the parts were destined for Iran.  Id. at

8.  All of this, the indictment asserts, was done without obtaining approval of the transactions from the Treasury Department's Office of Foreign Assets Control ("OFAC").  Id. at 5.

Count One of the indictment alleges the crime of "Conspiracy to Commit an Offense Against the United States," in violation of 18 U.S.C. § 371, and is based on a series of thirty-eight alleged overt acts in furtherance of that conspiracy, including a number of e-mail communications among the alleged conspirators.  Id. at 5-15.  Counts Two through Six are based on five separate indirect shipments of goods from CMHC in the United States to Iran, and each count alleges a "Violation of the United States Iranian Embargo," based on the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705(b), and the Iranian Transaction Regulations ("ITR") promulgated thereunder, principally 31 C.F.R. § 560.204 (prohibiting the indirect exportation "from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran" if those transactions are "undertaken with knowledge or reason to know that" the goods are "intended specifically" for subsequent delivery to Iran).  Id. at 15-18.  Counts Two through Six also charge the crime of "aiding and abetting" an offense against the United States or "causing" such an offense to be done.  Id. at 15-18.

The trial of defendants commenced on November 21, 2005, with the selection of a jury, and the presentation of evidence began on November 28.  At the close of the government's case-in-chief on December 2, each defendant moved for a judgment of acquittal, pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  See Tr. of Jury Trial at 1049, 1061.  As permitted by that rule, the Court reserved decision on the motions and allowed the trial to go forward, whereupon the defendants proceeded to put on their case.  See Fed. R. Crim. P. 29(b); Tr. of Jury Trial at 1075.  Today marks the close of all the evidence, and the Court will now resolve the

motions.  For the reasons provided herein, and based only on the evidence at the close of the

government's case, the Court concludes that judgments of acquittal are not warranted.

<u>ANALYSIS</u>

In considering a Rule 29 motion, the Court must view the evidence in the light most

favorable to the government and must determine whether the evidence presented at trial is

sufficient to sustain a conviction as a matter of law; in other words, the Court must decide

whether a reasonable jury could conclude that the government met its burden of proving each

element of the offense beyond a reasonable doubt.  <u>See</u> <u>United States v. Treadwell</u>, 760 F.2d 327,

333 (D.C. Cir. 1985).  For purposes of the present motion, defendants effectively have conceded

that the government has met its burden on all but one of the elements of the charged crimes:  the

"willful" state of mind that the law requires the government to prove the defendants had at the

time they engaged in the alleged prohibited acts and, for the conspiracy count, at the time they

joined in a plan to engage in the unlawful acts.  <u>See</u> 50 U.S.C. § 1705(b) (prescribing criminal

sanctions for persons who "willfully violate[], or willfully attempt[] to violate, any license, order,

or regulation issued under [IEEPA]"); <u>United States v. Feola</u>, 420 U.S. 671, 686 (1975) ("[I]n

order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute,

the Government must prove at least the degree of criminal intent necessary for the substantive

offense itself.").  All of defendants' arguments in support of their motions focus on that single

disputed element.

**I.      Defining the Element of Willfulness**

This Court previously has said that IEEPA's criminal provision "demands proof that a

defendant acted with knowledge of the illegality of his actions," <u>see</u> Order of Nov. 23, 2005, at 2,

and has further defined willfulness in this context as the "voluntary, intentional violation of a known legal duty," id. at 3 (citing United States v. Lizarraga-Lizarraga, 541 F.2d 826, 828 (9th Cir. 1976)).  Notwithstanding the Court's prior statement that "nothing in this ... formulation of willfulness demands that the government prove the defendants had specific knowledge of [the] licensing regime, as set out in the ITR," id. at 4, defendants now ask the Court to conclude that the "legal duty" of which the defendants must have had knowledge includes the particular duty to obtain a license from OFAC.  See Tr. of Jury Trial at 1053-54 (counsel for defendant Holland asserting that, to sustain a conviction, the government must demonstrate that defendants "knew that [a license] was required, knew that there was no such license held by the company, and intentionally failed to obtain the license").  Defendants interpret this Court's prior articulation of willfulness to mean that, although "the government need not prove that the defendants were aware that the licensing requirement was included in the Iranian Transaction Regulations," it still must "show that the defendants knew that there was *a* licensing requirement," even if they were not aware of the specific code provisions that create the requirement.  See Defs.' Supp. Submission on Willfulness at 2 (emphasis in original).

As the government has defined the crimes with which defendants are charged in the substantive offenses (Counts Two through Six) -- both in the indictment and in its proposed jury instructions -- included as an element of each offense is a specific omission:  the failure to obtain a license from OFAC.  See Indict. at 15-18; Gov't Prop. Supp. Instruct. No. 3.  Defendants have seized on that point in their motions for judgment of acquittal, arguing that IEEPA's willfulness requirement should apply to every element of the offense and that, because it should so apply, the government must produce sufficient evidence to support a reasonable jury's conclusion that

-4-

defendants knew of the need to obtain a license.

The Court cannot accept defendants' view of the scienter requirement for the charged offenses.  To do so would produce an absurd result:  A defendant could readily admit that he knew his exact conduct was illegal,[1] but he could nonetheless avoid criminal liability by convincing a jury that he did not know precisely *why* the conduct was illegal because he was unfamiliar with the specific licensing requirement.  Surely neither Congress in passing IEEPA nor the Executive Branch in promulgating the ITR intended to foreclose prosecution of persons who knew the gist, but not the exact details, of the law they are accused of violating.  A defendant's assertion, no matter how credible, that he "had not brushed up on the law" has never been deemed a sufficient defense to a crime requiring knowledge of illegality.  See Hamling v. United States, 418 U.S. 87, 123 (1974).  In fact, that is precisely the result that the Supreme Court sought to avoid when it upheld a conviction for willfully engaging in the sale of firearms without a federal license even though the government had not been required to prove that the defendant was aware of the particular requirement of a license.  See Bryan v. United States, 524 U.S. 184, 196 (1998).  As the Third Circuit said in a case involving a prosecution under the Arms Control Export Act ("ACEA"), "[i]f the defendant knew that the export was in violation of the law, we are hard pressed to say that it matters what the basis of that knowledge was."  United States v. Tsai, 954 F.2d 155, 162 (3d Cir. 1992).

Defense counsel, in support of their view of the government's burden in this prosecution, refer the Court to two Second Circuit cases that address the scienter element of a similar federal

---

[1] That is to say, he could admit that he knew that export-control laws and regulations broadly prohibit the precise conduct in which he engaged.

crime:  willful violation of the ACEA or the regulations issued thereunder (specifically, the

International Traffic in Arms Regulations, or "ITAR").  See 22 U.S.C. § 2778(c); 22 C.F.R. §

127.1.  Those cases approved jury instructions for an ACEA/ITAR offense that required proof

that a defendant had knowledge of the statute's licensing requirement.  In United States v.

Durrani, 835 F.2d 410 (2d Cir. 1987), the court affirmed an ACEA conviction where the trial

judge instructed the jury that a guilty verdict required proof that the defendant "knew he was

required to obtain an export license before causing defense articles to be exported," that he

"intentionally failed to do so," and that he nonetheless went ahead with the exports.  See id. at

423.  Three years later, in United States v. Smith, 918 F.2d 1032 (2d Cir. 1990), the same court

affirmed another ACEA conviction where the trial judge told jurors that an essential element of

the crime was that the defendant "knew about the licensing requirement" for exporters of certain

helicopters.  See id. at 1038.

     This Court does not question the correctness of those instructions.[2]  But even in ACEA

cases such as Durrani and Smith, where the trial court demanded that the government prove

knowledge of the licensing requirement to establish willfulness, there is no suggestion that the

government was required to prove specific knowledge of each and every aspect of the law that

was treated as an essential element of the crime -- for example, the fact that the goods in question

appeared on the United States Munitions List.  See also United States v. Murphy, 852 F.2d 1, 7

(1st Cir. 1988) ("[I]t is sufficient that the government prove that [defendant] knew he had a legal

duty not to export the weapons ...."); id. at n.6 ("[The law does not require] proof that the

_____

     [2] It should be noted, however, that an appellate court's decision to affirm a conviction
where a jury instruction imposed a particular burden of proof on the government does not mean
that an instruction imposing a lower burden would necessarily be improper.  Nothing in the
Durrani and Smith opinions is to the contrary.

defendant kn[e]w that the arms [we]re on the United States Munitions List.  Rather, ... all that the Government needs to prove is that the item exported appears on the Munitions List ... and, of course, that the defendant knowingly and willfully exported it, with the necessary intent and knowledge, and without the appropriate license.") (citing <u>United States v. Gregg</u>, 829 F.2d 1430, 137 (8th Cir. 1987)).

The Court also observes that the ACEA/ITAR regulatory scheme is quite different than the IEEPA/ITR regime.  The ACEA itself contains a licensing requirement, and it requires all arms exporters (with a few narrowly drawn exceptions) to obtain a license from the State Department before shipping to any foreign country.  It is, in short, a licensing statute that contemplates the general granting of licenses, subject to restrictions.  Indeed, the regulation that defines an ACEA violation expressly makes the crime dependent upon whether the accused acted "without first obtaining the required license or written approval from the Office of Defense Trade Controls."  <u>See</u> 22 C.F.R. § 127.1.  IEEPA, by contrast, contemplates the possible creation of a licensing regime, but by no means requires it.  And where the ITR do provide for licensing, the requirement applies only to a narrow group of exporters who would seek to do business with a specific country (Iran).  Furthermore, the regulation that defines the ITR violation charged in this case broadly prohibits all transactions with Iran, "[e]xcept as otherwise authorized pursuant to this part," <u>see</u> 31 C.F.R. § 560.204, but does not expressly specify the license requirement.  Given these variations, ACEA cases are of limited value in the context of determining the scienter requirement for an IEEPA/ITR prosecution.[3]

_____

[3] Defendants also refer the Court to a First Circuit opinion that mentions the scienter requirement for a conviction under the closely related Export Administration Act and its regulations, the Export Administration Regulations.  In that case, <u>United States v. Lachman</u>, 387 F.3d 42 (1st Cir. 2004), the trial judge instructed the jury that a conviction must be supported by

Moreover, adopting such a demanding interpretation of the government's willfulness burden would be at odds with the text and structure of the IEEPA/ITR regime. An export to Iran does not *become illegal* under IEEPA and the ITR by virtue of the failure to obtain OFAC authorization in the form of a license. Quite the contrary, the ITR clearly state that obtaining a license "has the effect of removing a prohibition." See 31 C.F.R. § 560.501(c). And, as noted above, the specific regulation that is at the forefront of this prosecution makes no direct mention of a licensing requirement. Instead, it prohibits all direct and indirect exports of goods, technology, and services to Iran by United States persons, "[e]xcept as otherwise authorized pursuant to this part." See 31 C.F.R. § 560.204. Authorization under Part 560 of Title 31 of the Code of Federal Regulations can take the form of a license, for sure, but it also appears to encompass various "exempt transactions," such as those identified in § 560.210. And, in fact, it explicitly refers to § 560.511, which permits the export of U.S.-origin goods to Iran via a third country if the goods will be incorporated into a foreign-made product before shipment to Iran and the U.S.-origin components are an "insubstantial" part of the end product. On defendants' view, these alternative forms of authorization presumably would also be elements of an IEEPA offense based on § 560.204, and the government would be required to prove in its case-in-chief that defendants not only knew that they needed a license before they could export to Iran, but that they also knew that the goods they were shipping did not qualify for any exceptions. Interpreting the law in this manner essentially would limit culpability only to persons who had actually reviewed the specific governing provisions of the United States Code and the Code of Federal

proof that the defendants "knew that the control panel ... that was being exported ... required an individual validated license and, yet knowing that, nevertheless, they undertook to export it without one." See id. at 47 n.7. The First Circuit stressed, however, that it had "no occasion to consider whether the trial judge correctly stated the scienter requirement of the EAA." See id.

Regulations before they acted -- a peculiar outcome, to say the least.[4]

Thus, the Court concludes that the "legal duty" of which the government must establish that defendants had knowledge does not include within its scope the OFAC licensing requirement, and therefore the government is not required to produce evidence that defendants possessed such specific knowledge in order to obtain a conviction here.  To the extent that defendants' motions for judgments of acquittal are based on the government's failure to marshal proof that defendants knew of a licensing requirement for Iran-bound exports, the motions must be denied.  In this case, what the government must show for each of the six counts, in terms of *mens rea,* is that defendants knew specifically that *indirect* exports to Iran (i.e., shipment through a middleman in a third country) were illegal.  See. e.g., Ratzlaf v. United States, 510 U.S. 135, 146-47 (1994) (to sustain a conviction for "willful" evasion of the reporting requirements of the

---

[4] A reasonable interpretation of the "except as otherwise authorized" clause of § 560.204 is that it creates an *affirmative defense* to a charge of willful violation of the regulation rather than defining a necessary *element* of such an offense.  Indeed, one of the cases to which defendants cite in their Rule 29 motion, Durrani, viewed the "official use" exception to the ACEA in precisely this manner.  See 835 F.2d at 421.  "Where ... a statutory prohibition is broad and an exception is quite narrow, it is more probable that the exception constitutes an affirmative defense and that the defendant bears the burden of demonstrating that his actions conformed to the limited exception."  Id.; see also United States v. Sun, 278 F.3d 302, 312 (4th Cir. 2002).

Practically speaking, the assignment of the initial burden of proof as to the existence or non-existence of a export license is of little consequence because it would be quite unusual to have a true dispute over that fact.  But if the willfulness requirement of IEEPA (as understood to mean a "voluntary, intentional violation of a known legal duty") were interpreted to demand knowledge that no license or other authorization existed, the distinction between an affirmative defense and an element would have legal significance.  If obtaining an OFAC license were an affirmative defense, the government would have no obligation in its case-in-chief to even prove that defendants failed to obtain the license, let alone that they *knew* that they needed to obtain a license and *knew* that they had not done so.

Be that as it may, the Court will not treat the ITR's licensing provisions as creating an affirmative defense in this case.  Because the government has elected to charge the failure to obtain an OFAC license as an element of the crime, the Court will treat it as such.

Bank Secrecy Act, it is not enough to prove that the defendant knew that cash transactions greater than $10,000 triggered reports and that he deliberately structured transactions to avoid triggering reports; the defendant also must have actual knowledge it was unlawful to structure transactions in such a manner).  The requirement of showing willfulness, however, does not extend to the element of the crime (as the government has defined it) of failure to obtain an OFAC license; the government need only prove that defendants did not get a license,[5] *not* that they knew they needed to get one and knew that CMHC did not have one.  See Tsai, 954 F.2d at 160 n.3 (The trial judge instructed jurors that "[t]he government must show that the defendant knew that the export was illegal, but it does not have to show that he knew all of the specifics of the law or was a lawyer or ever read the law ...."); id. at 162 (approving of instruction and stating that "[i]f the defendant knew that the export was in violation of the law, we are hard pressed to say that it matters what the basis of that knowledge was").[6]

Defendants' assertion that the government should be equitably estopped from arguing that it need not prove knowledge of the licensing regime -- based on a statement of the elements of an IEEPA offense that it provided in its prosecution of Mahmood -- has no merit.  "The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."  New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (quoting 18 Moore's Federal Practice § 134.30 (3d ed. 2000)).

The defense, however, acknowledges that in order for estoppel to apply the government's

---

[5] The defendants do not contend that the government has failed to prove this.

[6] See also United States v. Brodie, 403 F.3d 123, 147 (3d Cir. 2005) (Although "the government [must] prove that a defendant had general knowledge of the law which forbade his actions and acted with a specific intent to circumvent that law," it "need not prove that the defendant had knowledge of the *specific regulation* governing the conduct engaged in.").

"later position must be 'clearly inconsistent' with its earlier position." <u>See</u> Defs.' Reply to Gov't Supp. Mem. on Willfulness at 2 (quoting <u>New Hampshire</u>, 532 U.S. at 750).  But here it is far from certain that the position the government took in the <u>Mahmood</u> case is contrary to its current one.  In that case, the government described a violation of IEEPA as having four principal elements.  The first element, it said, was that "the defendant exported or attempted to export a controlled commodity"; the second element was that "the defendant failed to obtain the necessary license from [OFAC]"; the third element was that "the defendant acted knowingly and willfully"; and the fourth element was that "the defendant knew that the export was destined to a country to which the United States controls exports and requires a license for such exports." <u>See</u> Defs.' Supp. Submission on Willfulness Ex. A at 1-2.  As the Court has observed previously in this case, the government has been less than precise in its formulation of descriptions of these offenses, and this filing in the <u>Mahmood</u> case is yet another example of a statement of the export-control laws that is, at best, ambiguous with regard to *mens rea*.  It could be read to mean, as defendants take it, that the government must show the defendant acted "knowingly and willfully" in failing to obtain the necessary OFAC license (applying the third element to the two that precede it) or, based on a reading of the fourth element alone, that the government must show that the defendant knew that "the United States ... requires a license for ... exports" to the country where the goods were destined.  Indeed, that might even be the best reading of the government's statement.  But it also might be read as consistent with the government's present position, which is that the government must prove (1) the intentional export or attempted export to an embargoed country, (2) the failure to obtain an OFAC license for the export, (3) the knowledge by the defendant that what he was doing or trying to do was illegal, even if he did not actually know of

such details of the law as the licensing requirement, and (4) the knowledge by the defendant that the export was destined for Iran.[7]

Furthermore, there are additional requirements for the application of equitable estoppel that are not present here.  The party arguing equitable estoppel must show that its opponent "succeeded in persuading a court to accept [its] earlier position."  New Hampshire, 532 U.S. at 750; see also id. at 750-51 ("Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations,' and thus poses little threat to judicial integrity.").  As the government points out, defendants have offered no indication that the judge in the Mahmood case "even considered, let alone accepted, the elements of the offense that the government submitted to him" for purposes of Mahmood's plea hearing.  See Gov't Surreply on Willfulness at 2.  Finally, the estoppel doctrine, at its core, is based on detrimental reliance by the party asserting it; this is why traditional estoppel doctrines required mutuality of parties. Defendants were not parties to the Mahmood case.[8]  Although that fact, in and of itself, might not be enough for the government to overcome the estoppel argument, it is an appropriate consideration in determining "whether the party seeking to assert an inconsistent position would ... impose an unfair detriment on the opposing party if not estopped."  New Hampshire, 532 U.S. at 751.  Here, defendants have not given the Court any reason to think that they reasonably relied on the government's statement of law in the Mahmood case in preparing their defense here.

_____

[7] Had the government phrased the fourth element slightly differently, inserting the word "Iran" followed by a comma ("the defendant knew that the export was destined to *Iran,* a country to which the United States controls exports and requires a license for such exports"), the defendants' reading of this element would be less plausible.

[8] Indeed, as the government points out, the cases that the defendants cite for their estoppel argument all arose in matters that involved the same parties in both proceedings.  See Gov't Surreply on Willfulness at 3, n.2.

Equitable estoppel is, on these facts, unjustified.

To summarize, the Court concurs with the government's assertion that it need not prove to the jury that defendants had knowledge of the existence of a licensing requirement; it need only show that they knew their precise conduct was unlawful.  This conclusion is crucial to the proper formulation of jury instructions in this case, and the Court will instruct the jury in a manner consistent with this view of the law.  Specifically, the Court will instruct that the IEEPA/ITR offenses charged in Counts Two through Six consist of the following elements, each of which the government must prove beyond a reasonable doubt: (1) that the defendant exported goods from the United States to Iran, through a third country; (2) that the defendant did so willingly, that is, voluntarily and intentionally in violation of a known legal duty; (3) that the defendant knew or had reason to know that those goods were intended for delivery to Iran; and (4) that the defendant did not obtain the necessary license from OFAC before exporting the goods.[9]

## II.     Evidence Could Sustain Conviction on All Counts

Having determined the applicable legal standard, the Court now must decide whether the government is entitled to submit its case to the jury based on the evidence adduced during its case-in-chief -- i.e., whether that evidence is, pursuant to Rule 29 of the Federal Rules of Criminal Procedure, sufficient to sustain a conviction.  Defendants contend that, even under the willfulness standard the Court has adopted, the evidence presented by the government cannot

---

[9]  Defendants offer no legal support for their suggestion that the ITR placed the responsibility for obtaining an OFAC license on defendants' CMHC superiors rather than themselves or their argument that they had a "right to rely on their superiors within the company to assure all licenses were in place."  See Defs.' Reply Mem. on Willfulness at 6.  In any event, there is no requirement in the law that the government must produce evidence in its case-in-chief that defendants possessed authority within the corporation to make final decisions on such matters.

support a conviction because (1) the evidence offered to prove knowledge of illegality was temporally removed from the transactions at issue in Counts Two through Six and (2) the government, although it offered abundant proof that defendants collaborated to bring about shipments that all parties agree were unlawful, failed to offer sufficient proof of an agreement *to violate the law*, which is a necessary element of the charge of conspiracy.  As explained above, these arguments, at bottom, actually turn on the question of defendants' willfulness, i.e., their knowledge of the unlawfulness of their actual (and planned) conduct.[10]  Direct evidence of knowledge is, of course, rarely available, but "[c]ircumstantial proof of specific intent may suffice."  See United States v. Tooker, 957 F.2d 1209, 1214 (5th Cir. 1992).  The Court concludes that the government has, in fact, come forward with sufficient evidence for a reasonable jury to conclude (1) that the defendants knew their specific conduct -- shipping goods from the United States to Iran, via the UAE -- was illegal at the time they engaged or planned to engage in the conduct and (2) that, by virtue of that knowledge of illegality, the defendants' cooperative efforts to bring about those shipments constituted an agreement to commit an offense against the United States.

As for the charges against Quinn, who is alleged to be criminally responsible for all five transactions that form the basis for Counts Two through Six and to be guilty of participating in

---

[10] In order to sustain a conviction for conspiracy under 18 U.S.C. § 371, the evidence must show that the "defendant entered into an agreement with at least one other person," that the agreement was to commit an offense against the United States (in this case, violating the embargo on trade with Iran), that the defendant "knowingly participated in the conspiracy with the intent to commit the offense," and that "at least one overt act was committed in furtherance of the conspiracy."  See United States v. Mellen, 393 F.3d 175, 180-81 (D.C. Cir. 2004).  The defendants do not dispute the existence of an agreement; rather, they dispute that the agreement involved criminal intent.  Thus, if the evidence is sufficient to support a conviction on the substantive offenses, it also would be sufficient to support a conspiracy to commit those substantive offenses.

an illegal conspiracy, the government has produced evidence of an e-mail message that Quinn

sent to an executive of CMHC's Korean affiliate on December 21, 2003, in which he stated that

"the CMHC Parts group can not ship to Iran.  They can not even know the parts are shipping to

Iran." Gov't Ex. 386.  The government also has produced testimony -- from a federal agent who

questioned Quinn in December 2004 -- that indicates Quinn understood the unlawfulness of

coordinating transactions to accomplish an indirect export of goods to Iran.  See Tr. of Jury Trial

at 790-92, 797 (testimony of Agent Scott Douglas).  Defendants are certainly correct that there is

nothing conclusive about this evidence, because it reflected Quinn's understanding of the law

*after* all of the allegedly unlawful transactions in Counts Two through Six were complete.  But

viewing this evidence in the light most favorable to the government, it is circumstantially

probative of Quinn's knowledge about the law at earlier points in time.  Quinn is free to argue to

the jury that this evidence deserves little weight (that is, that the government failed to meet its

burden of persuasion).  But the Court is not prepared to say, as a matter of law, that all the

evidence against Quinn produced during the government's case-in-chief -- including that

discussed above -- is insufficient to sustain a conviction.

        With respect to the charges against Holland, who faces two counts of violating IEEPA

and the ITR for his role in two completed transactions as well as the charge of criminal

conspiracy, the government has produced evidence of an e-mail exchange with another CMHC

employee in which he was alerted to the existence of legal constraints on shipments to Iran.  See

Gov't Ex. 449; Tr. of Jury Trial at 640-48 (testimony of Paula Clark).  The government also has

produced evidence that Holland attended an OFAC-conducted training session on export-control

laws in November 2003, during which the details of the ITR -- including the prohibition on

indirect exports to Iran -- were outlined.  See Gov't Ex. 202a; Tr. of Jury Trial at 676-84

(testimony of Agent Mark Knoblock), 949-61 (testimony of OFAC Senior Compliance Officer

Hans Huber).  Again, viewing this evidence -- and all the evidence presented during the

government's case -- in the light most favorable to the government, the evidence is not so lacking

in probative value as to Holland's understanding of the law's requirements at relevant times that

the Court should preclude the jury from deciding whether to convict Holland of the charged

offenses.

## CONCLUSION

For the foregoing reasons, the Court will deny defendants' motions for judgment of

acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.[11]  The Court has issued

---

[11] Even if defendants were correct that the government must establish that they had knowledge of the licensing requirement, the outcome of their motions would be the same.  That is because, in a situation where the law demands such specific knowledge on the part of a defendant, the government would be entitled to a jury instruction on the concept of "willful blindness" or "conscious avoidance."  The thrust of such an instruction is that the law does not permit a defendant deliberately to "close his eyes to the obvious" and then plead ignorance of such readily ascertainable facts.  See Mellen, 393 F.3d at 184; see also United States v. Reyes, 302 F.3d 48, 55 (2d Cir. 2002) (a conscious-avoidance instruction is proper "when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance").  Although courts interpreting the willfulness requirement of other trade-regulating statutes have made clear that "[p]roof that the defendant negligently failed to investigate the regulations does not sufficiently prove [the] requisite mens rea," see United States v. Dien Duc Huynh, 246 F.3d 734, 742 (5th Cir. 2001) (emphasis added), conscious avoidance reflects something more:  a reckless or intentional disregard of probable illegality.  In such circumstances, courts have suggested that a failure to inquire might be tantamount to actual knowledge of illegality.  See, e.g., United States v. Frade, 709 F.2d 1387, 1394 (11th Cir. 1983) ("once the [defendants] realized that conduct similar to what they contemplated might be illegal[,] it was incumbent upon them to make further inquiry").  As this opinion holds, the government has produced sufficient evidence by which a reasonable jury could conclude that defendants had knowledge of the illegality of their specific conduct.  A reasonable jury could further conclude that defendants recklessly or deliberately failed to investigate the details of that law, and thus could find that, based on this conscious avoidance, defendants had knowledge of the contents of the relevant provisions, including the ITR's licensing requirement.

an order to that effect in open court on this date.


_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Dated:   _December 5, 2005_

Copies to:

Jay I. Bratt
Laura A. Ingersoll
OFFICE OF THE U.S. ATTORNEY FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
Email: jay.bratt@usdoj.gov
Email: laura.ingersoll@usdoj.gov

*Counsel for the United States*


Aitan Dror Goelman
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Washington, DC  20036-5802
Email: agoelman@zuckerman.com

Larry A. Mackey
BARNES & THORNBURG, LLP
11 South Meridan Street
Indianapolis, IN  46204
Email: larry.mackey@btlaw.com

*Counsel for defendant Robert E. Quinn*


Richard E. Plymale
FROST BROWN TODD, LLC
250 West Main Street, Suite 2700
Lexington, KY  40507-1749
Email: rplymale@fbtlaw.com

Robert Martin Adler
Paul L. Knight
O'CONNOR & HANNAN, LLP
1666 K Street, NW, Suite 500
Washington, DC  20036
Email: radler@oconnorhannan.com
Email: pknight@oconnorhannan.com

*Counsel for defendant Michael H. Holland*

-18-